NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 19-1984
_____

MATTHEW KOWALSKI,

*Appellant*

v.

POSTMASTER GENERAL OF THE UNITED STATES
_____

On Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. Civil No. 2-16-cv-01707)
Magistrate Judge: Honorable Cynthia Reed Eddy
_____

Submitted under Third Circuit LAR 34.1(a)
January 16, 2020

Before: HARDIMAN, PORTER, and PHIPPS, *Circuit Judges*.

(Filed: April 29, 2020)

_____

OPINION[*]
_____

---

[*] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

PHIPPS, *Circuit Judge*.

Matthew Kowalski worked for the United States Postal Service as a part-time Flexible Letter Carrier at the Greentree Branch Post Office in Pittsburgh, Pennsylvania from 2004 until his termination in 2012. After his termination, Kowalski sued the Postmaster General under the Rehabilitation Act, claiming discriminatory and retaliatory treatment due to his anxiety disorder. The District Court entered summary judgment against Kowalski, and in reviewing that judgment *de novo*, we will affirm.

I

This case is shadowed heavily by a prior employment dispute between Kowalski and the Postal Service. That disagreement arose in January 2011 out of a conversation that Kowalski had with his station manager in response to the reassignment of his normal route. During that exchange, Kowalski expressed his stress level, which he associated with a recent mass shooting in Arizona. Interpreting those statements as a threat within the meaning of the Postal Service's zero-tolerance policy, the station manager placed Kowalski on emergency off-duty status. As a result, Kowalski could return to work only upon providing medical substantiation that he was not a threat to himself or others.

During his absence, Kowalski was diagnosed with general anxiety disorder. After treating him for it, his psychologist supplied a letter stating that Kowalski was not a danger to himself or others. The Postal Service accepted that letter and scheduled Kowalski's return in late February 2011.

Perhaps due to a miscommunication, Kowalski did not arrive for work on the scheduled date. Instead, he appeared the next workday. But after marking him absent

2

without leave for the workday before, the Postal Service commenced termination proceedings against him and later issued a Notice of Removal, which Kowalski challenged through a grievance.

Kowalski and the Postal Service resolved that dispute through a Last Chance Agreement. As part of that agreement, Kowalski admitted that the Postal Service had just cause for the Notice of Removal. Also, he agreed that for two years he would adhere to all rules and regulations of the Postal Service, and he would comply with any order from his supervisor before disputing it. Those terms were strict, and Kowalski expressed reservations about them, in part because he did not get along with one of the managers, Tony Piergrossi. But ultimately, he signed the agreement and returned to work in July 2011.

Upon Kowalski's return, and consistent with his apprehensions, Piergrossi became his supervisor. Piergrossi disparaged and mocked Kowalski – calling him "Killer Kowalski," Appx. 325, and telling other postal employees that they should wear a bullet-proof vest around Kowalski. (Also, Kowalski testified that Piergrossi referred to him as "crazy" or "nuts," Appx. 325, but in a sworn statement, Piergrossi denies doing so, Appx. 489, ¶ 4.) Kowalski did not file a grievance to complain about Piergrossi's conduct.

On December 27, 2011, Kowalski and Piergrossi had a disagreement that became the undoing of Kowalski's tenure with the Postal Service. That day, Piergrossi ordered Kowalski to deliver mail on a rural route in addition to his regular route, and Kowalski did not do so. Kowalski argued that the additional assignment violated the collective bargaining agreement, and he requested an opportunity to speak with the union

3

representative. In a visible display of irritation, if not anger, Piergrossi denied that request. Kowalski nonetheless spoke with the union representative, who advised Kowalski to "carry the route, and grieve it later." Appx. 331. Kowalski followed a different course: he submitted an immediate request for sick leave asserting that due to his anxiety disorder, he did not feel comfortable driving. After Piergrossi orally denied that written request, he threw it in the trash. He then stated that he would have Kowalski fired and ordered Kowalski to leave the building. With that, Kowalski departed.

Due to that incident, the Postal Service began the process of terminating Kowalski. Another manager submitted a Request for Discipline, and Kowalski had an opportunity to respond. The Postal Service then issued a Notice of Removal for his termination, identifying two violations of the Last Chance Agreement: (i) failing to follow instructions and (ii) abandoning the route.

Through a grievance, Kowalski disputed that just cause supported his removal. A 'Step B Team,' which consisted of a representative from the Postal Service and a representative from the union, reviewed Kowalski's grievance. After finding just cause, the Step B Team directed that Kowalski's termination become official.

Kowalski next pursued his administrative remedies with the Postal Service's Equal Employment Opportunity Office. In challenging his termination, he alleged that the Postal Service terminated him not due to the Last Chance Agreement but rather due to his anxiety disorder and his osteoarthritis. Kowalski asserted that his supervisors "provoked him, called him names and subjected him to numerous workplace slights." Appx. 46. An Administrative Judge for the Equal Employment Opportunity Commission resolved

Kowalski's complaint without a hearing, concluding that "[a] preponderance of the record evidence does not prove that the actions complained of were taken on account of [Kowalski's] disability." Appx. 189. Kowalski appealed that decision to the EEOC's Office of Federal Operations, which affirmed the Administrative Judge's decision. It determined that "the alleged incidents were more likely the result of routine supervision, personality conflicts, and general workplace disputes and tribulations." Appx. 197.

Unsatisfied with the administrative adjudicatory process, Kowalski sued the Postmaster General under the Rehabilitation Act for discrimination and retaliation. In exercising federal-question jurisdiction over the lawsuit, *see* 28 U.S.C. § 1331, the District Court determined that Kowalski had exhausted only claims related to his termination, and on those, the District Court entered summary judgment for the Postmaster General.

Kowalski timely appealed that judgment, and we have jurisdiction over his appeal. *See* 28 U.S.C. § 1291.

II

On appeal, Kowalski challenges only the entry of summary judgment on his termination-related claims. He brings both of those claims – one for discrimination and the other for retaliation – under the Rehabilitation Act. But the Rehabilitation Act and its amendments contain several provisions prohibiting disability discrimination, and the resulting statutory scheme can fairly be described as "somewhat bewildering." *Lane v. Pena*, 518 U.S. 187, 196 (1996). Two relevant provisions permit causes of action against the federal government: Section 501 (codified at 29 U.S.C. § 791) and Section 504

5

(codified at 29 U.S.C. § 794).  *See* 29 U.S.C. § 794a(a)(1), (2).  Both causes of action have notable limitations.

Section 501 requires federal agencies to submit affirmative action plans for "the *hiring, placement, and advancement* of individuals with disabilities."  *Id*. § 791(b) (emphasis added).  It also recognizes the ability to sue for "*nonaffirmative action* employment discrimination under this section."  *Id.* § 791(f) (emphasis added).  By limiting claims to "*nonaffirmative action* employment discrimination," the cause of action under Section 501 is not for all employment discrimination, but only for that related to nonaffirmative action, meaning "the hiring, placement, and advancement of individuals with disabilities."  *Id*. § 791(b).

By contrast, Section 504 of the Rehabilitation Act permits claims for "employment discrimination."  *Id*. § 794(d).  But it has limitations too.  First, Section 504 applies only to disability discrimination in any "program or activity" receiving federal financial assistance or conducted by an executive agency or the Postal Service.  *Id*. § 794(b) (defining "program or activity" to implicate primarily entities receiving federal funding, as opposed to federal agencies themselves).  Second, Section 504 does not waive sovereign immunity for damages claims against federal agencies or the Postal Service.  *See Lane*, 518 U.S. at 196-97; *see also Barnes v. Gorman*, 536 U.S. 181, 188-90 (2002) (holding that "punitive damages . . . may not be awarded in suits brought under . . . § 504 of the Rehabilitation Act").  And third, Section 504 has a sole causation requirement, meaning the discrimination must be "solely by reason of . . . disability."  29 U.S.C. § 794(a).

Here, the parties disagree on whether Kowalski sues under Section 501 or Section 504. Kowalski's complaint did not specify either. Nor did his summary judgment briefing. In its summary judgment decision, the District Court viewed Kowalski as proceeding under Section 504. And Kowalski did not challenge that conclusion in his opening appellate brief. *See* Fed. R. App. P. 28(a)(5) (requiring a statement of issues presented for review). The Postal Service's appellate brief relied on the sole-causation limitation for Section 504 claims, and Kowalski then devoted most prominent attention in his reply brief to argue that he proceeds under Section 501.

Kowalski has enjoyed the best of both worlds for too long: an appellate reply brief is too late to identify the statutory basis for a cause of action. *See Shell Petroleum, Inc. v. United States*, 182 F.3d 212, 218 (3d Cir. 1999) ("[A litigant] must unequivocally put its position before the trial court at a point and in a manner that permits the court to consider its merits."); *see also United States v. Pelullo*, 399 F.3d 197, 222 (3d Cir. 2005) ("It is well settled that an appellant's failure to identify or argue an issue in his opening brief constitutes waiver of that issue on appeal."). Without arguing previously that his claim was under Section 501, Kowalski cannot do so for the first time in an appellate reply brief. He has not surrendered much, however, because his challenges on appeal involve only his termination – and not decisions made redressable by Section 501, *i.e.*, those regarding hiring, placement, or advancement.

### III

A plaintiff may support discrimination and retaliation claims through direct evidence, *see Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989), or indirect evidence,

*see McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). For his disability discrimination claim, Kowalski invokes both approaches. He supports his retaliation claim with only indirect evidence. None of that evidence brings any material fact into genuine dispute. *See* Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (explaining that a genuine dispute arises "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party"). And even viewing that evidence in the light most favorable to Kowalski, the Postal Service still merits judgment as a matter of law. *See* Fed. R. Civ. P. 56(a); *see also Smith v. City of Allentown*, 589 F.3d 684, 689 (3d Cir. 2009).

A.     Direct Evidence of Discrimination

In challenging the entry of summary judgment, Kowalski argues that he produced enough direct evidence of discriminatory animus to defeat summary judgment. The direct evidence standard originates in the mixed-motive context, where an adverse employment decision "was the product of a mixture of legitimate and illegitimate motives." *Price Waterhouse*, 490 U.S. at 247. For such a mixed-motive claim, "direct evidence" constitutes evidence that is "so revealing of retaliatory animus that it is unnecessary to rely on the *McDonnell Douglas / Burdine* burden-shifting framework, under which the burden of proof remains with the plaintiff." *Walden v. Georgia-Pacific Corp.*, 126 F.3d 506, 512 (3d Cir. 1997).

But this is not a mixed-motive case. Section 504 of the Rehabilitation Act does not premise liability on discrimination as a motivating factor for the adverse employment decision. *Cf.* 42 U.S.C. § 2000e-2(m) (permitting mixed-motive discrimination claims

8

under Title VII). Rather, Section 504 requires that a disability be the sole cause of the discrimination. *See* 29 U.S.C. § 794(a). Due to that sole-causation requirement, direct evidence that discrimination was *a* factor does not suffice. Rather, the direct evidence must establish that discriminatory animus was the sole cause of the adverse employment decision.

The evidence that Kowalski proffers does not meet that standard. He points to statements by Piergrossi that associate ill-will toward Kowalski with Kowalski's general anxiety disorder – words and phrases such as "nuts," "crazy," and "Killer Kowalski," as well as telling Kowalski's co-workers to wear a bullet-proof vest around Kowalski because he might go "postal." Appx. 325. From those statements, Kowalski argues that an anti-disability animus motivated Piergrossi in assigning Kowalski the additional route on December 27.

But that issue is immaterial. Kowalski must prove that discrimination was the sole cause of his *termination* – not merely the sole cause of the additional route assignment on December 27. And for that, he has no direct evidence. The record establishes that the Postal Service terminated Kowalski for violating his Last Chance Agreement by not carrying the additional route as instructed by his supervisor. It is undisputed that Piergrossi did not participate in that decision to terminate Kowalski. Piergrossi did not issue the Notice of Removal. Nor did he serve as the postal representative on the Step B Team. And Kowalski has no evidence that any decision-maker for his termination held any animus toward him due to his disability, much less that any such discriminatory animus was the sole cause for his termination.

9

Without any direct evidence of discriminatory animus by an actual decision-maker, Kowalski invokes, for the first time on appeal, a cat's paw theory of liability. Under that theory, which derives its name from one of Aesop's fables, *see Staub v. Proctor Hosp.*, 562 U.S. 411, 415 n.1 (2011), an "employer is at fault because one of its agents committed an action based on discriminatory animus that was intended to cause, and did in fact cause, an adverse employment decision." *Id.* at 421. But the cat's paw theory originated in the context of mixed-motive discrimination claims. *See id.*; *see also Jones v. Se. Pa. Transp. Auth.*, 796 F.3d 323, 330 (3d Cir. 2015); *McKenna v. City of Phila.*, 649 F.3d 171, 176-80 (3d Cir. 2011). And there, liability may rest on the animus and actions of an immediate supervisor, regardless of the motivation of the ultimate decision-maker. *See Staub*, 562 U.S. at 422; *see also Jones*, 796 F.3d at 330. Section 504, however, does not permit mixed-motive claims; rather, it requires that a disability be the sole, as opposed to a partial, cause of the adverse employment decision. *See* 29 U.S.C. § 794(a). That requirement removes Section 504 claims from the reach of the cat's paw theory. Thus, even if this newly raised argument were not forfeited, *see Huber v. Taylor*, 469 F.3d 67, 74 (3d Cir. 2006), Kowalski still could not overcome summary judgment here, where he lacks evidence of a decision-maker's discriminatory animus.

B.      Indirect Evidence of Discrimination and Retaliation

Kowalski also attempts to defeat summary judgment on his discrimination and retaliation claims through indirect evidence.  The dispute here is narrow.[1]  It pertains only to the third stage of the *McDonnell Douglas* analysis, which, for both discrimination and retaliation claims, permits a plaintiff to avoid summary judgment by demonstrating that the employer's stated reason is pretextual.  *See generally McDonnell Douglas*, 411 U.S. at 802-04 (articulating the three stages of indirect proof for discrimination); *Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 193 (3d Cir. 2015); *Woodson v. Scott Paper Co.*, 109 F.3d 913, 920 (3d Cir. 1997) (explaining that the *McDonnell Douglas* framework generally applies to retaliation claims).

Kowalski argues that the proffered reasons for his termination were pretextual.  Proving pretext requires two showings: (i) that the stated reason was false, and (ii) that discrimination was the real reason.  *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993).  This Circuit, however, has held that a plaintiff can survive summary judgment within the *McDonnell Douglas* framework by producing evidence of *either* of those two prongs.  *See Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994); *see also Keller v. Orix Credit All., Inc.*, 130 F.3d 1101, 1108 (3d Cir. 1997) (*en banc*).

Kowalski directs his efforts to the first prong – demonstrating that the Postal Service's stated reasons were false.  That showing demands something more than

---

[1] The parties do not contest that the *McDonnell Douglas* framework applies to Kowalski's efforts to prove discrimination and retaliation indirectly.  Nor do they dispute that Kowalski's discrimination and retaliation claims satisfy the first two *McDonnell Douglas* stages (a *prima facie* case and a legitimate non-discriminatory reason).

evidence that "the employer's decision was wrong or mistaken." *Fuentes*, 32 F.3d at 765; *see also Keller*, 130 F.3d at 1108. Instead, it requires proof of "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them unworthy of credence." *Fuentes*, 32 F.3d at 765 (citation and quotation marks omitted); *see also Keller*, 130 F.3d at 1108-09.

Kowalski identifies such a contradiction with respect to the job-abandonment justification for his termination. Because Piergrossi ordered him to leave work, Kowalski could not have abandoned his job in derogation of his supervisor's order or in violation of the Last Chance Agreement.

But Kowalski must demonstrate the falsity of *each* stated justification for his termination. *See Fuentes*, 32 F.3d at 764-65. And the Postal Service also terminated him for violating his Last Chance Agreement due to his refusal to carry the additional route on December 27. Kowalski argues that he did not actually refuse to carry the route, rather he was requesting an accommodation.

The Postal Service cannot be faulted for reaching a different conclusion. Kowalski did not originally mention a disability as the reason he did not carry the route; he challenged the route as a violation of the collective bargaining agreement. And by not carrying the route and disregarding his supervisor's order not to speak with the union representative, Kowalski violated his Last Chance Agreement, which required him to obey supervisors' orders and submit grievances later. And as a matter of law, his request for sick leave after the situation became more tense does not retroactively legitimize his

12

prior conduct. *See Curay-Cramer v. Ursuline Acad. of Wilmington, Del., Inc.*, 450 F.3d 130, 137 (3d Cir. 2006) ("But as the Supreme Court has held, an employer need not refrain from carrying out a previously reached employment decision because an employee subsequently claims to be engaging in protected activity."). Thus, Kowalski has not demonstrated pretext for each basis for the Postal Service's termination decision.

\* \* \*

For the foregoing reasons, we will affirm the District Court's order entering summary judgment for the Postmaster General.